23CA2007 Peo v Smith 07-23-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA2007
Garfield County District Court No. 21CR383
Honorable Anne K. Norrdin, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Dean Allen Smith, Jr.,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE TAUBMAN*
Freyre and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 23, 2026

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Mackenzie R. Shields, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    Defendant, Dean Allen Smith, Jr., appeals his judgment of conviction entered on a jury verdict finding him guilty of one count of sexual assault on a child — position of trust.  The jury also made special findings that the sexual assault was part of a pattern of abuse and that the victim was under the age of fifteen.  After an evidentiary hearing following the conviction, the trial court designated Smith a sexually violent predator (SVP).  The trial court sentenced him to twenty years to life in the custody of the Department of Corrections.  Smith alleges that the trial court erred by (1) declining his recusal motion despite presiding over a related case; (2) allowing the prosecutor to engage in repeated misconduct; and (3) designating him an SVP.

¶ 2    We disagree and, therefore, affirm the judgment of conviction and the trial court's designation of Smith as an SVP.

I.    Background

¶ 3    The prosecutor presented the following evidence on which the jury found Smith guilty.

¶ 4    The victim, M.B. — a minor child — told a family member and some of her friends that her father, Smith, had been sexually abusing her.  The family member reported the abuse through his

1

mother to the Garfield County Department of Human Services (the Department), which began investigating Smith for sexual assault on a child. The Department conducted forensic interviews with M.B. and other individuals who had been told about the abuse, spoke with Smith, and interviewed Smith's ex-wife and her daughter, both of whom reported that Smith had also sexually abused his former stepdaughter. M.B. disclosed at least five separate acts of Smith sexually abusing her — beginning when she was elementary school-aged and continuing into her teenage years.

¶ 5 After the investigation concluded, Smith was arrested and charged with sexual assault on a child — position of trust. Following a two-week trial, the jury found him guilty and entered its special findings: that Smith had sexually abused M.B., who was younger than fifteen years old, in five different instances, constituting a pattern of abuse.

## II. Recusal

¶ 6 Smith contends that the trial court judge erred in not recusing herself because she had presided over a related case. We disagree.

## A.    Additional Facts

¶ 7     Judge James Boyd presided over most of the trial court proceedings, but after he retired, Judge Anne Norrdin presided over the remainder of the pretrial litigation and the trial.

¶ 8     Before trial, Smith moved for Judge Norrdin to recuse herself, arguing that she was impermissibly prejudiced due to (1) her prior employment with the District Attorney's Office; and (2) her presiding over a related Garfield County case involving Smith's wife.  The trial court denied the motion.

¶ 9     The related case, Case No. 20DR88, between Jodie Smith (Smith's wife) and her ex-husband concerned custody over their child, A.B.  A.B., M.B.'s stepsibling, lived in the Smiths' home when Smith sexually abused M.B.  Following Smith's arrest, the ex-husband filed a motion to restrict parenting time, requesting full-time custody of A.B. because of the pending criminal charges against Smith.  After a hearing, Judge Norrdin granted the ex-husband's motion and restricted Jodie Smith's parenting time based on her unwillingness to cooperate with the Department's investigation, her actions indicating some denial about the seriousness of the allegations against Smith, and possible

impairment of her protective capacity for the children in her care, "who [were] at risk from . . . Smith." *See People v. Sa'ra*, 117 P.3d 51, 55-56 (Colo. App. 2004) (a court may take judicial notice of the contents of court records in a related proceeding). The trial court then set a hearing about the allocation of parental responsibilities for A.B.

¶ 10    At the allocation of parental responsibilities hearing, the testimony focused on the charges Smith was facing and several eventual witnesses at his criminal trial testified. The trial court ordered that the restrictions on Jodie Smith's parenting time would continue due to its concern that "she may not take action to . . . protect [A.B.] if she were in harm's way . . . [and] her failure to recognize the severity of the charges against her husband and the potential risk that he pose[d] to potentially all the children." Further, the trial court was troubled that Jodie Smith did not seem to "want[] to know [whether M.B. had been sexually abused] because of what it might mean for her husband's legal situation." Judge Norrdin continued presiding over the child custody case throughout Smith's trial, issuing her final order in that case after his conviction and sentencing.

¶ 11    In denying Smith's motion for recusal, Judge Norrdin held, in part, that under the extrajudicial source doctrine, her involvement in the domestic relations case involving Smith's wife did not warrant her recusal.

### B.    Standard of Review and Applicable Law

¶ 12    We review de novo whether a trial court judge's recusal was required.  *Sanders v. People*, 2024 CO 33, ¶ 25, 549 P.3d 947, 952. A judge must recuse herself when she demonstrates actual bias. *People v. Jennings*, 2021 COA 112, ¶ 20, 498 P.3d 1164, 1170-71. Actual bias is bias that "in all probability will prevent a judge from dealing fairly with a party."  *Id.* at ¶ 28, 498 P.3d at 1172.  To establish actual bias, the record must clearly show that the judge had a substantial bent of mind against the party; mere speculative statements and conclusions are not enough.  *Id.*

¶ 13    The Federal and Colorado Due Process Clauses mandate recusal "when, objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'"  *Sanders*, ¶ 29, 549 P.3d at 952 (emphases omitted) (quoting *Rippo v. Baker*, 580 U.S. 285, 287

(2017)). A risk of bias that is "too remote and insubstantial does not violate the Due Process Clause." *Id.* at ¶ 32, 549 P.3d at 953.

¶ 14 The Colorado Code of Judicial Conduct (C.J.C.) Rule 2.11(A) requires a judge's recusal "not only when the judge harbors an actual bias but also when a 'reasonable observer might have doubts about the judge's impartiality.'" *Sanders*, ¶ 52, 549 P.3d at 956 (quoting *People in Interest of A.G.*, 262 P.3d 646, 650 (Colo. 2011)). One such circumstance is where "[t]he judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding." C.J.C. 2.11(A)(1). However, an appearance of partiality (also referred to as apparent bias) alone does not mandate reversal under the C.J.C. *See Sanders*, ¶ 50, 549 P.3d at 955 (holding that while a judge's involvement in a matter might create an appearance of partiality warranting recusal, that alone does not establish that the judge was actually biased such that reversal is required).

¶ 15 Section 16-6-201(1)(d), C.R.S. 2025, and Crim. P. 21(b) set forth parallel grounds for judicial recusal. *Sanders*, ¶ 39, 549 P.3d at 953. Both require judicial disqualification when "it could be *reasonably* inferred from the facts alleged in the motion [to recuse]

6

and supporting affidavits that the judge has a bias or prejudice that will *in all probability* prevent him or her from dealing fairly with a party." *Id.* at ¶ 40, 549 P.3d at 954 (quoting *People v. Arledge*, 938 P.2d 160, 166-67 (Colo. 1997)). As it relates to judicial recusal, section 16-6-201(1)(d) and Crim. P. 21(b) "have the same scope as the Due Process Clauses of the United States and Colorado Constitutions." *Id.* at ¶ 43, 549 P.3d at 954.

¶ 16    The extrajudicial source doctrine "will ordinarily protect a judge from disqualification based on knowledge gained in the course of her judicial duties" and "prevents comments demonstrating a negative opinion of the parties or witnesses from serving as a basis for disqualification as long as such comments arose from knowledge gained during court proceedings." *People v. Roehrs*, 2019 COA 31, ¶ 22, 440 P.3d 1231, 1237. However, if a judge's opinion regarding a defendant's guilt or innocence is "so pronounced that it is likely to affect the judge's ability to be impartial at trial," recusal would be appropriate even considering the extrajudicial source doctrine. *Id.*

## C. Preservation

¶ 17    The People contend that Smith only partially preserved this issue for appellate review. We agree.

¶ 18    To preserve an argument for appeal, a party must present the "sum and substance of the argument" to the trial court. *Marquez v. Schaefer*, 2025 COA 44, ¶ 30, 571 P.3d 920, 926 (quoting *Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 25, 543 P.3d 409, 415).

¶ 19    In his motion for recusal, Smith relied on section 16-6-201 and Rule 2.11 of the C.J.C. These arguments are unquestionably preserved for appellate review. However, notably absent from Smith's motion is any assertion that recusal was required under Crim. P. 21 or the Due Process Clauses. Because neither of these bases for recusal was argued before the trial court, neither was preserved for regular appellate review and we will thus review them for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120 (noting that we review unpreserved contentions for plain error).

¶ 20    Plain error is error that is obvious and substantial. *Id.* We reverse under plain error review only if an error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt

on the reliability of the judgment of conviction." *Id.* (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

### D. Analysis

¶ 21 As an initial matter, Smith does not reassert on appeal, as a basis for recusal, his argument about Judge Norrdin's previous employment, so it is abandoned and we therefore decline to address it. *See People v. Brooks*, 250 P.3d 771, 772 (Colo. App. 2010) (holding that we do not address claims not reasserted on appeal). He now only contends that Judge Norrdin's involvement in the related child custody case required her recusal.

¶ 22 We first analyze whether recusal was required under section 16-6-201 or C.J.C. 2.11 — the two sources of authority that Smith preserved for our review.

¶ 23 First, to the extent that Smith contends that Judge Norrdin was actually biased against him, we disagree. Her comments about the accusations Smith was facing did not "in all probability" prevent her from dealing fairly with Smith. *Jennings*, ¶ 28, 498 P.3d at 1172. The record does not establish that she had a substantial bent of mind against him, and as noted, "mere speculative statements and conclusions are not enough" to show actual bias.

9

*Id.* Rather, the record indicates that Judge Norrdin was careful not to prejudge Smith's guilt or innocence when presiding over the custody case.

¶ 24    Second, Smith has not sufficiently shown that it could be reasonably inferred from the facts alleged in his motion and supporting affidavits that Judge Norrdin had an appearance of partiality. *Sanders*, ¶ 40, 549 P.3d at 954. Her comments did not demonstrate that she had prejudged Smith's guilt or innocence — rather, she focused on the seriousness of the allegations for the safety of the children in the Smith home. Judge Norrdin almost exclusively used conditional language in referencing the charges, noting potential risk to the children *if* the allegations, given their severity, were true. Judge Norrdin's order and reasoning focused on Jodie Smith's response to serious allegations that had the potential to jeopardize the safety of children in her care, not whether Smith was guilty of the charges.

¶ 25    Further, under the C.J.C., while a "judge's involvement in a case might create an appearance of impropriety warranting recusal, that alone does [not] imply that the judge was biased. Only when a judge was actually biased will we question the reliability of the

10

proceeding's result." *People in Interest of A.P.*, 2022 CO 24, ¶ 29, 526 P.3d 177, 183 (citation omitted).

¶ 26 We additionally note as an aside that the supreme court's jurisprudence about judicial recusal under the four aforementioned bases is somewhat unclear. While a showing of apparent bias could mandate reversal for due process concerns, and under section 16-6-201 and Crim. P. 21 when there is a showing of an objectively reasonable probability that a judge will be unable to deal fairly with a party, *Sanders*, ¶ 42, 549 P.3d at 954, the supreme court did not explain how this standard differs from a showing of actual bias.

¶ 27 Moreover, it is less clear when such a showing would necessitate reversal under C.J.C. 2.11. *See id.* at ¶¶ 49-52, 549 P.3d at 955-56 (stating that, absent a showing of actual bias, a trial court judge's potential violation of the C.J.C. does not require reversal; however, the C.J.C. requires disqualification when a "reasonable observer might have doubts about the judge's impartiality" (quoting *A.G.*, 262 P.3d at 650)); *see also A.P.*, ¶ 29, 526 P.3d at 183 (holding that, while both an appearance of partiality and actual bias are grounds for recusal from a case under the C.J.C., only when a judge was actually biased will we question

11

the result).  Under *Sanders*, the presence of an appearance of partiality "might not require reversal (because an appearance of partiality does not necessarily establish that a biased judge presided over the case)."  *Sanders*, ¶ 51, 549 P.3d at 955-56.  Even though the C.J.C. mandates judicial recusal in some instances of apparent bias claims, it is uncertain when, on appeal, not recusing for apparent bias would require reversal under *A.P.* and *Sanders*.

¶ 28     Further, the extrajudicial source doctrine, on which Judge Norrdin relied in denying the motion to recuse, also counseled against recusal because her comments in the child custody case did not indicate a likelihood that they would affect her ability to impartially preside over Smith's criminal trial.  *See Roehrs*, ¶ 22, 440 P.3d at 1237.  Additionally, she did not obtain information through presiding over the child custody case that raised "reasonable questions about her ability to impartially weigh the testimony" during Smith's criminal trial.  *Id.* at ¶ 33, 440 P.3d at 1240.  (Indeed, in Smith's trial, the jury weighed the testimony.)  Therefore, Smith did not show that it could be reasonably inferred that Judge Norrdin, in all probability, could not deal fairly with him.  Because Smith has not shown that Judge Norrdin was actually

12

biased against him and we have determined that his apparent bias claim also falls short, Judge Norrdin did not err under section 16-6-201 or C.J.C. 2.11.

¶ 29    Having found no error in Judge Norrdin's denial of Smith's recusal motion under section 16-6-201 and C.J.C. 2.11 after reviewing the issue de novo, we likewise determine that Judge Norrdin did not plainly err by not recusing herself under Crim. P. 21 or for federal and state due process concerns. As mentioned, section 16-6-201(1)(d) and Crim. P. 21(b) "have the same scope as the Due Process Clauses of the United States and Colorado Constitutions" relating to judicial recusal. *Sanders*, ¶ 43, 549 P.3d at 954. Given that the statutory and due process clause arguments contemplate the same scope regarding the judicial recusal analysis, it follows that — given our conclusion that Judge Norrdin did not err under section 16-6-201 — she did not plainly err under either due process or Crim. P. 21 grounds. *See People v. Gregor*, 26 P.3d 530, 531 (Colo. App. 2000) (concluding that because there was no error, we need not consider whether there was plain error).

¶ 30    Therefore, we find no error here, let alone plain error.

### III.    Prosecutorial Misconduct

¶ 31    Smith argues that the prosecutor engaged in four instances of misconduct that deprived him of a fair trial.  We disagree.

### A.    Additional Facts

¶ 32    While cross-examining Smith, the prosecutor asked him if events in two witnesses' testimony "never happened," to which Smith replied "[c]orrect," and "[y]eah, that never happened."  The prosecutor also asked Smith if one of the witnesses was "some kind of genius," after which defense counsel objected to relevance.  After the objection was overruled, Smith replied, "I think he's just a normal person."  Finally, the prosecutor asked Smith if the two witnesses were "some sort of genius[es]" or "mastermind[s]," to which Smith responded "[s]he could be," and "I wouldn't say mastermind, but she's extremely intelligent."

¶ 33    During closing arguments, the prosecutor said to the jury, "[S]o you would have to believe that three witnesses are conspiring against all of this because [M.B.] [is] mad at Jodie [Smith].  So she makes up the sexual assault against [Smith]?  That is unreasonable."  The prosecutor also said, "If this was a false accusation [and] her life was just torn apart as a teenager . . . she

14

would have said . . . hold on.  None of this happened . . . .  But she did [not].  She never recanted.  She never recanted."

¶ 34     Later, during closing arguments, the prosecutor said to the jury, "[Smith] said he saw evidence of conspiracies on [M.B.'s] phone.  Remember that? . . .  Where is that evidence?"  However, during trial, defense counsel sought to introduce the entirety of a cell phone report generated from M.B.'s phone, but the prosecutor objected on relevancy grounds.  In response, Smith's counsel proposed to redact any messages not considered relevant.  The court allowed Smith to admit the document with those redactions.

¶ 35     Before trial, the parties litigated the admissibility of M.B.'s forensic interview.  At a motions hearing, Smith argued that the interview was not admissible as child hearsay, but if it were, the prosecutor needed to redact references to other children believed to be potential victims of Smith.  The trial court determined that the interview was admissible but ordered the redactions requested by Smith.  Smith later proposed additional redactions, to which the prosecutor agreed.  The forensic interview was admitted at trial with the agreed redactions and with no further objections.  Notably, the forensic interview included information about uncharged acts of

15

abuse by Smith.  During closing arguments, the prosecutor referenced the uncharged acts.

### B.     Standard of Review and Applicable Law

¶ 36     When reviewing a prosecutorial misconduct claim, we engage in a two-step analysis.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we must "determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances."  *Id.*  Second, we consider whether the conduct warrants reversal under the proper standard of review.  *Id.*

### C.     Preservation

¶ 37     The People assert that Smith did not preserve this issue for appellate review.  We agree.

¶ 38     Smith's sole objection to the alleged misconduct was in response to the question, "Did [one of the witnesses] come across as some sort of mastermind to you?"  Smith's counsel objected on relevance grounds.

¶ 39     An issue is unpreserved for appellate review when "an objection or request was made in the trial court, but on grounds different from those raised on appeal or on unspecific grounds which would not have alerted the trial court to the issue of which

16

the defendant now seeks review." *People v. Ujaama*, 2012 COA 36, ¶ 37, 302 P.3d 296, 304 (citation omitted). That is the situation here — Smith's relevance objection did not sufficiently alert the trial court to the alleged prosecutorial misconduct of which he now seeks review.

¶ 40    Therefore, we review Smith's prosecutorial misconduct contentions for plain error. *Hagos*, ¶ 14, 288 P.3d at 120.

### D.    Analysis

¶ 41    Smith alleges the prosecutor committed misconduct in four different ways during trial: (1) improperly directing Smith to comment on the credibility of other witnesses; (2) lowering the burden of proof and injecting her opinion into the case; (3) deliberately misrepresenting the evidence known to her; and (4) eliciting improper CRE 404(b) evidence. He also contends that this misconduct cumulatively requires reversal. We address each in turn to determine whether there was plain error mandating reversal.

¶ 42    First, while the prosecutor's questions while cross-examining Smith were improper, it was not plain error for the trial court to allow them. Asking a criminal defendant to opine on the credibility

of other witnesses' testimony is improper. *Liggett v. People*, 135 P.3d 725, 732 (Colo. 2006). The prosecutor's questions about whether events happened and whether witnesses were geniuses or masterminds improperly asked Smith to opine on the truthfulness of other witnesses. However, any error resulting from these questions was not so obvious and substantial as to cast serious doubt on the reliability of the jury's judgment of conviction. *See Hagos*, ¶ 14, 288 P.3d at 120. Because the questions were relatively limited in scope, and because counsel's objection did not alert the court to potential misconduct, we conclude that any error was not "so clear-cut, so obvious, that a competent trial judge should [have been] able to avoid it without [the] benefit of [an] objection." *People v. Beilke*, 232 P.3d 146, 152 (Colo. App. 2009). Therefore, the trial court did not plainly err during Smith's cross-examination.

¶ 43     Second, the prosecutor did not tell the jury that it had to disbelieve the witnesses to acquit Smith and did not improperly inject the prosecutor's personal opinion into the case. Rather, the prosecutor indicated to the jury that evidence supporting M.B.'s credibility should lead it to conclude that Smith's theory of defense

18

was unreasonable. Additionally, the prosecutor properly argued that the jury should find M.B. credible. This was not the prosecutor's opinion; it was a fair comment on the evidence presented at trial. Thus, it was not plain error for the trial court to allow these statements during closing argument.

¶ 44 Third, Smith forfeited both his deliberate misrepresentation of the evidence claim and his CRE 404(b) contention. These arguments were never presented to the trial court, so Smith forfeited them. *People v. Tallent*, 2021 CO 68, ¶ 13, 495 P.3d 944, 948; *see also Phillips v. People*, 2019 CO 72, ¶ 17, 443 P.3d 1016, 1022 (stating that forfeiture occurs where a party neglects to present an argument to the trial court and, unlike waiver, does not require intent).

¶ 45 Through proposing, and agreeing to, redactions to both the cell phone report and the forensic interview, Smith forfeited any claims that the prosecutor committed misconduct by admitting the other acts evidence, by commenting on it during closing arguments, or by stating that Smith had presented no evidence of a conspiracy in the cell phone report. Nothing in the record indicates that any of the redactions to the cell phone report included exculpatory

information of which the prosecutor was aware. Further, Smith challenged the admission of other evidence under CRE 404(b) but not the admission of the forensic interview under CRE 404(b). This implies that he was aware he could have challenged the admission of the forensic interview under CRE 404(b) but neglected to assert that right. He also agreed to redact much of the cell phone report, indicating that he did not intend to argue about what was redacted. The prosecutor was therefore within her right to comment on the lack of evidence presented by Smith, and he forfeited the right to argue otherwise. *See People v. Gibson*, 203 P.3d 571, 577 (Colo. App. 2008) (holding that a prosecutor is entitled to comment on the absence of evidence to support a defendant's contentions).

¶ 46    Accordingly, we review these contentions for plain error. *Tallent*, ¶ 13, 495 P.3d at 949. Again, plain error must be both obvious and substantial, and we reverse under this standard only if the error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14, 288 P.3d at 120 (quoting *Miller*, 113 P.3d at 750). Neither of Smith's forfeited contentions raises errors so obvious that the trial court should have, sua sponte, excluded the

stipulated-to evidence or intervened under CRE 404(b).  Thus, it was not plain error for the trial court to admit the redacted cell phone report and forensic interview.

¶ 47    Finally, because we have not determined that there were multiple instances of prosecutorial misconduct, we do not address Smith's assertion that the cumulative effect of the prosecutor's misconduct warrants reversal.

¶ 48    Accordingly, we hold that the trial court did not plainly err by allowing the prosecutor to engage in misconduct.

IV.    Sexually Violent Predator Designation

¶ 49    Smith asserts that the trial court erred when it concluded he met the statutory requirements to be designated an SVP.  Again, we disagree.

A.    Additional Facts

¶ 50    After Smith's conviction, the trial court held an evidentiary hearing to determine whether to designate him an SVP under section 18-3-414.5, C.R.S. 2025.  The hearing focused on whether Smith had promoted a relationship with M.B. primarily for the purpose of sexual victimization — an element required to find Smith an SVP.  § 18-3-414.5(1)(a)(III).  After finding that Smith had

21

promoted a relationship with M.B. for sexual victimization, the trial court concluded that Smith met the other statutory criteria and designated him an SVP.

## B.     Standard of Review and Applicable Law

¶ 51     We interpret the SVP statute de novo. *Allen v. People*, 2013 CO 44, ¶ 4, 307 P.3d 1102, 1105. A trial court's SVP designation, a mixed question of law and fact, is reviewed "by deferring to the trial court's factual findings when they are supported by the record, and reviewing de novo the trial court's legal conclusions regarding whether an offender should be designated as an SVP." *Id.*

¶ 52     As relevant here, one of the required statutory elements to designate an offender an SVP is that he "established or promoted a relationship" with the victim "primarily for the purpose of sexual victimization." § 18-3-414.5(1)(a)(III).

## C.     Analysis

¶ 53     Smith claims it was error to determine that he promoted a relationship with M.B. for the purpose of sexual victimization.

¶ 54     After the hearing regarding whether Smith would be designated an SVP, the trial court found that Smith met the "promoted a relationship" element of the statute. An offender

promotes a relationship when he and the victim have had a previous relationship, "limited in its nature, purpose, and customary time and place of interaction," but the offender encourages "the expansion of that relationship to foster sexual victimization." *People v. Valencia*, 257 P.3d 1203, 1207 (Colo. App. 2011). Smith asserts that he and M.B. did not have a limited relationship that he expanded primarily for the purposes of sexual victimization and that his actions did not turn his already broad father-daughter relationship into one that was primarily for sexual victimization. We disagree with both contentions.

¶ 55 Smith's relationship with M.B. before the abuse began was a father-daughter relationship; it was not sexual in nature until Smith encouraged the expansion of the relationship to foster sexual abuse. As discussed at the hearing, Smith directed M.B. to wear revealing clothing and showed her pornography, uncharged conduct that supports the trial court's conclusion he undertook to expand his relationship with her. These actions clearly establish that Smith and M.B. had a normal father-daughter relationship until Smith — for the primary purpose of sexual victimization — took predatory actions to broaden the relationship. The trial court

correctly held that Smith satisfied the necessary elements of the SVP statute, including the "promoted a relationship" prong.

## V.   Disposition

¶ 56    We affirm the judgment of conviction and the trial court's designation of Smith as an SVP.

JUDGE FREYRE and JUDGE KUHN concur.